[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION TO STRIKE
By an amended complaint the plaintiff seeks to recover from the defendant town and the defendant company for damages allegedly suffered as a result of petroleum contamination which allegedly emanated from underground storage tanks located at a town garage in Thomaston, Connecticut.
The defendant town has filed a motion to strike against the fourth count alleging negligence per se and the fifth count alleging ultra hazardous activity.
(1.) CT Page 1690
The first count alleges common law negligence and in the first eight paragraphs, more specifically paragraph 7, the plaintiff sets forth the factual predicate of its common law negligence liability theory.
Interestingly the negligence per se count relies on the same factual allegations as a basis to assert its negligence per se claim under Sections 22a-427, 22a-430, and 22a-450 of the general statutes.
Superior Court cases that have considered whether a cause of action can be based on the state Water Pollution Control Act have ruled that such a cause of action cannot be maintained, Oink Inc..et al. v. Ann Street Limited Partnership et al.,12 Conn. L. Rptr. 547
(1994), Wiehl v. Dictaphone Corp, 10 Conn. L. Rptr. 591
(1993), Andrews v. Caron Brothers, 6 Conn. L. Rptr 214 (1992),Michael v. Kenyon Oil Co., 4 CSCR 337 (1989).
As the plaintiff notes the issue of whether a private cause of action can be based on the act is a different issue analytically from whether violation of the statutory or regulatory provisions of environmental acts can be held to be negligence per se. The Restatement 2d Torts recognizes the distinction, see § 874A which discusses tort liability for violation of legislative provisions and in comment (e) notes that negligence per se is a doctrine that is long established. The comment goes on to note that the latter doctrine is discussed in § 286-288C and § 874A "serves to supplement" those sections not alter them "and to indicate the potential effect on other torts of legislative provisions proscribing or requiring certain conduct." Several cases also recognize the distinction between the two theories of recovery but differ on the effect that a determination that no private cause of action can be based on environmental acts should have on whether or not standards set forth in the statutes or administrative regulations issued pursuant to these statutes should be the basis for a negligence per se claim, Schwartzman Inc. v. Atchinson Topeka Santa Fe Ry,857 F. Sup. 838 (D.N.M., 1994), Lutz v. Chromatex Inc.718 F. Sup. 413 (M.D Pa. 1989), Bagley v. Controlled EnvironmentCorp, 503 A.2d 823 (NH, 1986), Connecticut Light Power v.Knight, 3 CSCR 600 (1988), cf Sanford St. Local Dev. v. TextronInc., 768 F. Sup. 1218 (WD. Mich. 1991).
Whether or not to adopt as a negligence standard of conduct CT Page 1691 the requirements of a statute or an administrative regulation is determined by the general principles laid down in § 286 of the Restatement 2d Torts. A court considers whether the purpose of the statute or regulation is to:
 "(a) to protect a class of persons which includes the one whose interest is invaded and
 (b) to protect the particular interest which is included and
 (c) to protect that interest against the kind of harm which has resulted, and
 (d) to protect that interest against the particular hazard from which the harm results "
It is true that the doctrine of negligence per se has not been confined to reliance on statutes having to do with motor vehicle violations. In Panaroni v. Johnson, 158 Conn. 92 (1969) it was held that the New Haven housing code imposed an affirmative duty on a landlord beyond that imposed by common law regarding the repair of outside and inside stairs and porches, Id. 100-102. Gore v.People's Savings Bank, 235 Conn. 360, 3798 et seq. (1995) gave negligence per se treatment to the specific statutory requirements regarding the presence of lead paint in apartments. But these two cases involve, like motor vehicle statutes, discrete requirements concerning particular activity and conditions not broad regulatory schemes adopted by administrative agencies. In Gore the court noted at page 381; "The legislature's adoption of these specific hazards as per se violations of § 47a-7 suggests that the legislature considered the various risks and benefits associated with the continued use of lead-based paints and meant to hold landlords to a particular standard of conduct." The language to note in this quote is "specific hazard" and the court went out of its way to note that a legislative body made the requisite determinations.
In this regard the Restatement notes that: "The courts have tended to adopt administrative standards less frequently than those of legislative enactments (§ 286, comment d) and at § 288 B comment d: "More frequently than in the case of statutes or ordinances the requirements of administrative regulations are not adopted by the court as defining a definite CT Page 1692 standard of conduct in negligence actions but are accepted as affording relevant evidence. The courts have tended to look, more often than in the case of a statute, to the nature of the regulation, the circumstances of the case, and particularly to the character and importance of the administrative body which has issued the Regulation."
The reasons for the reluctance of courts to adopt administrative regulations as standards for negligence per se is evidently based on the same concerns which have led courts not to hold that these acts create private causes of action, cf. Oink etal v. Ann Street, supra. The point is that pursuant to these acts administrative agencies manufacture complicated regulations covering broad areas of activity. It is one thing for a court to look at a particular statute or even regulation covering an isolated activity and determine that it should adopt the standard set forth in the statute or regulation as a per se negligence standard, cf Commercial Union Ins. Co. v. Frank Perotti Sons,Inc., 20 Conn. App. 253, 258 (1989), it is quite another thing to have a court adopt a whole, undefined body of administrative regulations such as alluded to in § 22a-430 as a standard to be applied in negligence cases on a per se basis. In paragraph 12 of the negligence count the allegations of negligence are that the defendant failed to properly maintain certain tanks so as to avoid discharge of hazardous material, failed to properly operate them, install and remove them, failed to supervise their operation installation, removal, refilling "and other uses of the tanks", and failed to design, construct build and operate the town garage to prevent the discharge. I'm sure that a whole battery of regulations enacted pursuant to §§ 22a-430 and 22a-450 govern these myriad activities.
Some courts have used the regulatory scheme in environmental law cases to establish negligence per se standards, Bagley v.Controlled Environment Corp., 503 A.2d 823, 827 (Me, 1986, Souter, J.), Clark v. U.S., 660 F. Sup. 1164, 1177 (WD Wash, 1987), Knockumv. Amoco Oil, 402 So.2d 90, 96-97 (LA, 1981). Bagley is the only case offering any analysis. Interestingly the court says that the environmental statutes and regulations don't provide the basis for a private cause of action but then says that presented no problem because it was merely adopting traditional negligence per se doctrine in referring to the regulations as setting forth the standard of care. One of the primary reasons for its holding was the court's reference to the fact that the attorney general could bring a damage action for costs of containment and cleanup in CT Page 1693 behalf of the general public (as in our act) so why not allow a private cause of action for the personal injury suffered by a private party apart from and in addition to that suffered by the public in general. But a private cause of action to recover for private party injuries is permissible under several theories of liability three of which are set forth in this amended complaint nuisance, negligence, etc. so how is the Bagley reasoning supportive of a position that a negligence per se rule is required? Also the Bagley court could have used this reasoning to find a private cause of action was created by the legislation — it did not. And I suppose the point is that to permit a negligence per se rule adopting administrative regulations is tantamount to saying there is a private cause of action under the statute, SanfordStreet Local, supra 768 F. Supp. at p. 1224. As said inFrederick L. v. Thomas, 578 F.2d 513, 517 (CA 3, 1978):
 "(m)ost formulations of the standards for implying a private cause of action center on the presence or absence of a legislative intent to impose civil liability. In theory, at least, application of the negligence per se doctrine represents a judicial policy judgment independent of legislative intent with respect to the imposition of civil liability. Both, however, address the question of whether the policy behind the legislative enactment will be appropriately served by using it to impose and measure civil damage liability."
See also Lutz v. Chromatex, supra 718 F. Supp. at p. 428,Schwartzman, Inc., 857 F. Supp. at p. 850.[1]
In this complicated area the Restatement approach seems persuasive. As said in Comment (d) to § 288 B of the Restatement 2d Torts . . ."administrative regulations are not adopted by the courts as defining a definite standard of care in negligence actions but are accepted as affording relevant evidence." This appears to be a workable standard. In Wendland, for example, the court held a negligence per se instruction was improper (for reasons admittedly having nothing to do with the question now before the court) but the court at 184 Conn. page 181 did say that admission of the OSHA regulations was not thereby precluded, if applicable, as evidence of the standard of care. The regulations "can provide helpful guidance to the jury in a civil case." CT Page 1694
Illinois and Michigan take interesting approaches. In Illinois violation of a statute or ordinance designed to protect . human life or property is prima facie evidence of negligence. Such a violation is not negligence per se and may be rebutted by proof that the party acted reasonably under the circumstances Dini v.Naiditch, 170 N.E.2d 881 (1960), Johnson v. Pendergast,
139 N.E. 407 (1923). Also see Michigan case law which appears to be the same effect, Klanseck v. Anderson Sales Service, Inc.,393 N.W.2d 356 (Mich., 1986). This appears to be the general rule as to negligence per se in these states. That of course is too limiting under our case law but it is an attractive method of dealing with the appropriate effect of administrative regulations as opposed to statutory enactments in complicated regulatory areas. Such a rule accords appropriate respect and value to the day to day decisions of administrative agencies and their expertise but interposes the shield of a common law jury between application of administrative regulatory standards and private parties when the statute which is the source of the regulations is held not to provide the basis of a private cause of action and/or a far ranging regulatory scheme is involved. In such a situation the specific regulations are imposed not by the popularly elected legislature but by state agencies not open to as much public scrutiny or public debate over their actions.[2]
With these understandings in mind I will grant the motion to strike the fourth count insofar as it is based on negligence per se.
(2.)
The fifth count is based on a claim of ultrahazardous activity. That count relies on the first eight paragraphs of the first count for certain factual allegations. In those paragraphs it is alleged the defendant town built and maintains a garage on a parcel of land and in part uses the land "as a refueling depot" for various governmental vehicles, (par. 4). Paragraph 5 refers to certain tanks and "associated piping, pumps and appurtenances" that the town maintains "for the storage and dispensing of leaded and unleaded gasoline and diesel fuel." The seventh paragraph alleges agents of the town "have caused the discharge, spillage, uncontrolled loss seepage or filtration of certain hazardous and noxious materials, "contaminants," from the tanks and the town property into the environment and more particularly (par. 8) on or into property owned by the plaintiff water company. CT Page 1695
The fifth count itself in paragraph 9 alleges that the contaminants "by their nature or by their use storage, disposal or discharge are abnormally dangerous." The defendant town should have known all this (par. 10) and the town's "improper use, storage, disposal or discharge of the contaminants created a serious risk of environmental contamination that could not be eliminated by the exercise of reasonable care and which damaged and continues to damage" the plaintiff's property.
The defendant town has moved to strike the fifth count claiming that the issue of whether an activity is abnormally dangerous is a question of law for the court, Caporale v. C.W.Blakeslee Sons. Inc., 149 Conn. 79, 86 (1961), Green v. Engsign-BickfordCo., 25 Conn. App. 479, 485, cert. den. 220 Conn. 919
(1991), Plourde v. Hartford Electric Light Co., 31 Conn. Sup. 192
(1974), Dunphy, et al. v. Yankee Gas Services Co.,15 Conn. L. Rptr. 294 (1995).
Formulating the perceived task of the trial court in that way imposes a heavy burden on a defendant because it might be said that the necessary predicate facts for making the determination of law can't properly be developed by means of a motion to strike. I think it's more productive to approach the problem from the point of view of determining whether the factual allegations of the complaint set forth a legally sufficient basis for a claim of ultrahazardous activity. If they don't, the claim is stricken, the plaintiff can plead over and if it does so the matter can be properly set up for the factual questions that have to be resolved in a motion for summary judgment. Given the strict requirements of this doctrine, at least as I interpret it, it may be difficult for counsel in good faith to plead over and that will be the end of the matter short of appeal.
What is an ultrahazardous activity, how is it defined? The plaintiff says there are two tests in Connecticut one set forth inCaporale v. C.W. Blakeslee, supra at 149 Conn. page 85 and one set forth in Green v. Ensign-Bickford Co., 25 Conn. App. at page 485, et seq. which explicitly refers to Sections 519 And 520 of the Restatement (Second) Torts. The shorthand version of the doctrine in Caporale doesn't necessarily conflict with or set lesser or different standards than the Restatement rule or at least, I don't believe, intentionally did so. This is so because in setting forth its rule the Caporale Court specifically cited Whitman HotelCorporation v. Elliott Watrous Engineering Co., 137 Conn. 562
(1951) which explicitly referred to the Restatement test as a CT Page 1696 criteria used to determine whether the blasting activity before it was ultrahazardous Id. at page 565.
The language used in the cases which attempts to define whether certain activity is ultrahazardous is very general and sometimes capable of being used in conflicting ways. It is true that the only case's where the Supreme Court or Appellate court in our state have found ultrahazardous activity have involved blasting, Whitman v. Elliott Watrous Eng. Co., supra, Worth v.Dunn, 98 Conn. 51, 59 (1922), use of pile driver, Caporale v. C.W.Blakeslee Sons, Inc. supra, conducting research with highly volatile chemical, Green v. Ensign-Bickford Co., supra. But such an observation does not provide a rational basis for ipso facto holding the doctrine shouldn't be applied to other types of activity claimed to be hazardous; thus Superior Courts have held the following activity to be ultra hazardous, disposal of hazardous waste. Barnes v. General Electric Co., 14 Conn. L. Rptr. 455
(1995), use of underground storage tanks and pumps for fuel, SNETCo. v. Clifford, 5 Conn. L. Rptr. 303 (1991), Michael v. Kenyon OilCo., 4 CSCR 337, 339 (1989). Courts in other states have also held that storage and disposal of contaminants is an ultrahazardous activity, State DEP v. Ventrol Corp., 468 A.2d 150 (NJ, 1983),Schwartzman Inc. v. Atchinson, Topeka Santa Fe Ry Co.,842 F. Sup. 475 (D.N.M., 1993). There are of course cases going the other way on these activities and others holding they were ultrahazardous.[3]
The appropriate method to determine whether a particular activity should be defined as ultrahazardous is to refer to the general statement of the doctrine in our few appellate cases and thus in effect to rely on the extended discussion of the appropriate guidelines set forth in the Restatement (Second) Torts which our appellate cases seem to use as a reference point. This makes sense since as these high risk businesses and their insurers are involved to an increasing extent in interstate activities it would be unfortunate if each state developed its own little law as to liability for ultrahazardous activity thereby leading to conflicting standards which would necessarily cause confusion to plaintiffs and defendants alike.
Defining something as an ultrahazardous activity is a weighty step since if this is done it would seem to me cost of capital might very well increase as well as the cost of insurance coverage of existing businesses. This would be unfortunate if existing common law remedies gave adequate protection to allegedly injured CT Page 1697 parties. It must be remembered that one of the primary reasons for the development of the whole doctrine in Rylands v. Fletcher, L.R. 1 Ex. 265 aff. LR 3 H.L. 330 (1868) was that existing nuisance and trespass doctrine didn't provide relief for a party injured by discharges from the defendant's land, see Prosser v. Keeton onTorts, 5th Ed., § 78, page 545.
Also one of the key factors in the decision as to whether an activity is ultrahazardous is a determination that there is an "inability to eliminate the risk by the exercise of reasonable care", Restatement (Second) Torts § 520(c). As the court said at 842 F. Supp. page 478 in Schwartzman v. Atchinson, Topeka SantaFe Ry, supra:
 "The theoretical premise for strict liability is that the activity is of such utility to the community that conducting it is not negligence", on the other hand, the activity's commensurate risks cannot be eliminated by the exercise of reasonable or even utmost care. Therefore, the defendant cannot be excused on the basis of any precautions taken and must pay for the harm he (sic) causes."
If this in fact is the theoretical basis for the doctrine and the prospective defendants involved in the activity and especially their insurance carriers accept the conclusion as a given — they'll have to at least in defense litigation — there is strong pressure at least in the short run to direct efforts not at eliminating the danger of the activity by developing new technology but to containing the extent of damages.
It is for these reasons I believe that courts should be wary about extending strict liability theories where there are other adequate theories of liability available to parties who claim they have been injured.
The activity sought to be declared ultrahazardous must be looked at closely in the (usually business) context which it is conducted. Also the broad language of the cases must be read in light of the particular activity they are discussing.
In 1988 Judge Hennessey held in Burns v. Lehigh, Inc., et al.3 CSCR 722 that underground storage of gasoline in tanks was not ultrahazardous. In 1995 she held in Barnes v. General Electric Co,CT Page 1698et al., 14 Conn. L. Rptr. 455 that disposal of hazardous waste in a municipal landfill constitutes an ultrahazardous activity. Although many of the cases in this area talk about the storage anddisposal of hazardous waste as if the phrase encompassed one factual entity that has to be dealt with as such in defining whether an ultrahazardous activity exists, this is of course not true. Burns and the Barnes case do not reach contradictory results. The contradiction is only a linguistic one created by the fact that courts sometimes create words that define broad areas of activity and sometimes thereby connect different phases of activity linguistically when practically speaking there should be no actual connection: for purposes of legal analysis. Barnes involved the disposal of metals, solvents, PCBs and other hazardous waste directly into a landfill. The plaintiffs claimed that these materials contaminated their property and posed a health danger to them. This is a similar situation to the leading New Jersey case of State DEP v. Ventron, 468 A.2d 150 (1983) where the defendants allegedly dumped dangerous waste directly onto several acres of land thereby contaminating the water in a creek that flows into the Meadowlands, Id. at p. 154, see also Rylands v. Fletcher, supra, water poured into reservoir on open land. These courts, Barnes andVentron, understandably held the activities before them to be ultrahazardous. Dangerous contaminants were involved and they were being dumped on the soil with obvious risk of migration of these contaminants. Barnes and Ventron are cases not of storage strictly speaking but of direct disposal of contaminants into the soil or the environment.
But the storage of contaminants in tanks presents an entirely different legal and factual problem. The fact that a substance can be dangerous if dumped on the soil or fatal if swallowed or inhaled does not mean that when the substance is reasonably handled and safely stored as part of the industrial or business activity it is used in, its use or storage should be defined as an ultrahazardous activity. There is no factual or scientific basis that the court is aware of to say — and it is not alleged here — that all hazardous materials are highly corrosive and therefore are incapable of being stored safely. There is no factual basis for the court to conclude — and it also is not alleged here — that because a material is hazardous it necessarily follows that any business using the material must necessarily dispose of it into the environment no matter how careful the business is. In other words it cannot be said that the nature of all hazardous materials is such that no matter what industrial or business activity they are used in, they will be dispersed into the environment even though CT Page 1699 the business involved is responsible and takes every step to avoid the danger. That is the reason why several courts, see footnote 2 supra, have, I believe, refused to hold that the mere allegation that gasoline is stored defines that activity as ultrahazardous, see also Philip Morris Incorporated v. Emerson, 368 S.E.2d 268
(1968), cf case like Dunphy v. Yankee gas Services Inc., supra, holding that mere transmission of natural gas is not an ultrahazardous activity.
Turning to the particular factual allegations of the Fifth count what do we really have here? Town property is used to store gasoline in tanks and as is necessary various town vehicles come to the facility to get gas (par. 4 5). That's what happens at garages that are open to the public — gas is stored in underground tanks and people go get gas. Paragraphs 7 and 8 go on to say employees of the facility have caused the discharge, spillage, uncontrolled loss, seepage or filtration of hazardous material, including but not limited to gasoline. This apparently is the "disposal" element of the claim but in this regard paragraphs 10 and 11 become confusing if an ultrahazardous activity claim is being made. Paragraph 10 says the defendant town knew or should have known that the contaminants "by their use, . . . disposal or discharge are abnormally dangerous. But paragraph 11 goes on to claim:
 "Thomaston's improper use, storage, disposal or discharge of Contaminants created a serious risk of environmental contamination that could not be eliminated the exercise of reasonable care and which damaged and continues to damage Well Field." (emphasis added).
All of this underlines a certain dilemma. I don't believe the plaintiff means to say that in a facility where gasoline products are stored and dispensed to motor vehicles some of the gasoline is always spilled no matter how careful everyone is — that would make every gas station and its operation an ultrahazardous activity. But if that is the plaintiff's position and since conclusory pleadings can't be used to withstand a motion to strike, how does the plaintiff claim factually that any spillage or discharge of the materials that occurred here was the result of non-negligent activity? What factual allegations spell out how the discharge or spillage occurred. And insofar as the plaintiff says it's the "improper" use, storage, disposal that created the problem, (see par. 11), then we have simple negligence. As said at 774 F. Supp. CT Page 1700 392 in the Arlington case.
 "An activity is abnormally dangerous if it is `dangerous in its normal or nondefective state . . . For strict liability purposes, the danger cannot be predicated on `mere casual or collateral negligence of others with respect to the (the activity) under the particular circumstances' . . . (the plaintiff's particularized approach to defining the nature of an activity would, in effect, enable plaintiffs to invoke strict liability for all negligently conducted activity."
In other words if the spillage or dispersal of the contaminants into the environment occurs as the result of negligence there is no reason to recognize a strict liability claim. If this is not the case — and frankly it is hard to imagine how this would be so — then even if the plaintiff pleads over won't we still be dealing with a facility that stores and dispenses gasoline. If that's the case how are subsections (d)(e) and (f) of § 520 of the Restatement to be dealt with by the plaintiff either at the next motion to strike or especially at summary judgment?
Those subsections require a court to consider the extent to which the activity is not a matter of common usage, inappropriate to where it is carried on or the value of the activity to the community — all considerations here which would argue against a finding of an ultrahazardous activity for what is essentially a facility serving as a gas station for government vehicles. That specific question is not before me now, however. But I will strike the fourth and fifth counts as presently set forth.
Thomas Corradino, Judge